# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

DANNY BILLS,

        Plaintiff,

v.                                                  CIVIL ACTION NO. 3:18-1232

OS RESTAURANT SERVICES, LLC,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Motion for Partial Summary Judgment submitted by Plaintiff Danny Bills and the Motion for Summary Judgment submitted by Defendant OS Restaurant Services, LLC. ECF Nos. 37, 39. Plaintiff asserts, in his complaint, a single claim against Defendant for discriminating against him based upon his disability, in violation of the West Virginia Human Rights Act ("WVHRA"). *See Compl.*, ECF No. 1-2, at 4–6. Defendant now moves for summary judgment on this single claim, arguing that Plaintiff does not qualify as a "disabled person" under the WVHRA, and that, even if he does, the undisputed facts prove that Defendant did not discriminate against him as a matter of law. *See Def.'s Mot. for Summ. J.*, ECF No. 39, at 1. Plaintiff, on the other hand, asserts that material disputes of fact exist for these issues, and moves for partial summary judgment on Defendant's affirmative defense that Plaintiff was terminated because his disability made him a direct threat to others in the workplace. *See Mem. in Supp. of Pl.'s Mot. for Partial Summ. J.*, ECF No. 38, at 1–2, 8.

The parties have fully briefed the issues and the motions are now ripe for adjudication. As explained below, the Court **DENIES** both Plaintiff's Motion for Partial Summary Judgment and

Defendant's Motion for Summary Judgment.

**I. Background**

Over twenty years ago, in 1995, Defendant hired Plaintiff as a dishwasher at the Outback Steakhouse in Huntington, West Virginia. *See Dep. of Bills*, ECF No. 39-1, at 9, 11. Throughout his employment, Plaintiff progressed to work in several different positions at the restaurant. *See id.* at 11–12. However, during the last few years of his employment, Plaintiff worked primarily at the "bloom station," while occasionally assisting other employees at their stations when necessary. *See id.* at 12–13.

In 2005 Plaintiff developed a vision condition known as macular degeneration. *See id.* at 27. By approximately 2016 his vision became so impaired that he could no longer read, and in 2018 he was diagnosed as legally blind. *See id.* at 48, 80. Because Plaintiff's impaired vision impacted some of his duties at the restaurant, Defendant made various accommodations. For example, a manager would clock Plaintiff in and out of his shifts, and coworkers would read the meal tickets to him,[1] create pre-made bags of ingredients for him, and label his products. *See Dep. of Bills*, at 26–27, 32–33, 40–41, 59. However, Tony Cloninger, a managing partner at the restaurant, testified that Plaintiff's coworkers developed "animosity" toward Plaintiff because he could not assist them due to his visual impairment. *See Dep. of Cloninger*, ECF No. 39-2, at 16, 35.

In order to eliminate the complaints from coworkers, Mr. Cloninger testified that Plaintiff was moved to the day shift to perform maintenance work, such as sweeping floors and washing dishes. *See id.* at 44. However, because budget constraints made it difficult to allow Plaintiff to

---

[1] While Plaintiff testified that coworkers would shout what was needed even if he did not have vision issues, he acknowledged that in the past, before his vision impairment, he would physically read the meal tickets and not rely on his coworkers. *See Dep. of Bills*, at 34–35.

work as many hours as he had in the maintenance role, Mr. Cloninger stated that he was forced to transfer Plaintiff back to his night shift position at the bloom station. *See id.* at 44, 49–50. As a result of this move back to the night shift Plaintiff contacted Jona Ford, Defendant's regional director, to discuss his schedule. *See id.* at 50–52; *Dep. of Ford*, ECF No. 39-3, at 12–15. It was also around this time—late January of 2018—that Mr. Cloninger emailed Defendant's corporate office and raised concerns about Plaintiff's ability to perform his job and the potential for injury that Plaintiff created due to his vision. *See Dep. of Morris-McGrath*, ECF No. 39-4, at 15–17.

On February 20, 2018, Ms. Ford met with Plaintiff and Mr. Cloninger at the restaurant to discuss Plaintiff's scheduling concerns. *See Dep. of Bills*, at 62–63. After the meeting, Ms. Ford expressed concerns regarding Plaintiff's vision to Defendant's legal department, which then instructed Plaintiff to visit an eye doctor. *See id.* at 63. Plaintiff agreed and visited his eye doctor, Dr. Robert Dundervill, on March 9, 2018. *See id.* However, before Plaintiff visited Dr. Dundervill, Defendant's Labor and Employment Paralegal, Ali Morris-McGrath, sent a letter to Dr. Dundervill. *See id.* at 73–74; *Dep. of Morris-McGrath*, at 11. In the letter, Ms. Morris-McGrath described what she believed were the essential functions of Plaintiff's position and asked Dr. Dundervill to provide his opinion on what accommodations, if any, would allow Plaintiff to perform the essential functions. *See Dep. of Bills*, at 73–74.

On March 9, 2018, Dr. Dundervill responded to Ms. Morris-McGrath's letter, and stated that Plaintiff's vision "should allow him to function in most environments," but that "[a]nything that requires fine detailed vision will be difficult for him to do." *See id.* at 85; *Dep. of Morris-McGrath*, at 50–51. Ms. Morris-McGrath then sent a second letter to Dr. Dundervill on March 13, 2018, and requested clarification on the specific issue of whether Plaintiff could perform the essential job duties safely. *See Dep. of Morris-McGrath*, at 51–53. On March 29, 2018, Dr.

Dundervill responded by saying that it is "impossible to predict someone's ability to perform job duties and job descriptions based solely on their level of visual function." *See id.* at 68–69. He then recommended that Defendant observe Plaintiff working and see if he can perform the duties that are required based on his job description. *See id.* at 69. Five days after receiving this response, Mr. Cloninger terminated Plaintiff at the instruction of Ms. Morris-McGrath. *See Dep. of Cloninger*, at 112. As a result of his termination, Plaintiff filed his complaint against Defendant for disability discrimination under the WVHRA. *See Compl.*

## II. Standard of Review

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, a court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, a court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Any inference, however, "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citation omitted). Therefore, summary judgment will not be granted if a reasonable jury could return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 247–48.

## III. Discussion

### A. Unlawful Discrimination Under the WVHRA

The WVHRA prohibits employers from discriminating against individuals based upon their blindness or disability when, despite the disability, "the individual is able and competent to

perform the services required." *See* W. Va. Code §§ 5-11-2, 5-11-9(1). In *McDonnell Douglas Corp. v. Green*,[2] the United States Supreme Court created a three-step burden-shifting test for Title VII employment discrimination cases, and the West Virginia Supreme Court has adopted this three-step test for discrimination cases such as this. *See Knotts v. Grafton City Hosp.*, 786 S.E.2d 188, 194 (W. Va. 2016). "The first step under *McDonnell Douglas* is to determine whether the plaintiff has made a prima facie case of discrimination." *Id.* at 194. If the first step is satisfied then the court moves to the second step, where "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the negative action taken against the complainant." *Id.* Finally, if this second step is met, the third step requires that the plaintiff "prove that the employer's reason was pretextual." *Id.*

### 1. Whether Plaintiff Has Stated a Prima Facia Case for Disability Discrimination

Defendant first claims that Plaintiff cannot state a prima facie case of discrimination. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 10. To establish a prima facie case of disability discrimination under the WVHRA a plaintiff must show that (1) he meets the definition of "disabled," (2) he is a "qualified disabled person," and (3) he was discharged from his job. *See Hosaflook v. Consolidation Coal Co.*, 497 S.E.2d 174, 178–79 (W. Va. 1997). There is no dispute in this case that Plaintiff meets the definition of "disabled" and that he was discharged from his job. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, ECF No. 40, at 8–10. Thus, the only prima facia element that Defendant disputes is whether Plaintiff has demonstrated that he was a "qualified" disabled person. *See id.*

A "qualified disabled person" is one "who, with or without reasonable accommodation, can perform the essential nature of the job." *Skaggs v. Elk Run Coal Co., Inc.*, 479 S.E.2d 561, 576

---

[2] 411 U.S. 792 (1973).

n.9 (W.Va. 1996). Thus, if an employee cannot perform the essential function of the job, even with reasonable accommodations, then the law does not protect that employee. *See id.* A job function may be considered "essential" for several reasons, including but not limited to the following: (1) because the reason the employment position exists is to perform that function; (2) because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (3) because of the amount of time spent on the job performing the function. *See* W. Va. Code R. § 77-1-4.2.

Defendant claims that Plaintiff was not a "qualified disabled person" because "Defendant was forced to have a coworker perform Plaintiff's duties or to eliminate them altogether." *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 10. The Court disagrees.

It is Plaintiff's burden to establish a prima facia case, and thus his burden to assert sufficient facts for a reasonable juror to conclude that he could have performed the essential functions of his job. Plaintiff has satisfied this burden. He testified that there were various duties he could perform while working at the bloom station even after his vision deteriorated, such as retrieving ingredients out of storage, mixing cheeses, whipping butter, and cooking "blooms." *See Dep. of Bills*, at 28–29, 31–32. Further, it can be reasonably inferred from this testimony that these acts are "essential" functions of working as a bloom station employee. Thus, for Defendant to successfully rebut this inference and demonstrate as a matter of law that Plaintiff could not perform the essential functions of a bloom station employee, Defendant must assert that there were *other* essential functions that Plaintiff could not perform, and the assertion must be undisputed. While Defendant does assert that there were functions Plaintiff could not perform,[3] whether these functions were "essential" to

---

[3] *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 8 (asserting that Plaintiff required assistance clocking in and out of his shifts, reading the tickets or monitor that displayed customer orders, portioning out ingredients to make sauces, labeling products to comply with food safety requirements, reading recipe cards, and confirming that tableware was clean and free from debris after going through the dishwasher).

the performance of a bloom station employee is a factual issue that Plaintiff disputes, and therefore an issue the Court cannot rule on.

While Defendant claims that "Plaintiff *concedes* that all of these functions [that he could not perform] are essential,"[4] the citation Defendant provided does not support this erroneous statement. Rather, Plaintiff merely agreed that it was "expected" of employees who have been cross-trained to assist others, that the "back of the house … was kind of a team atmosphere" where "everybody kind of works together to make sure the food's made," and that his "duties" included some of the actions that he could not perform without assistance. *See Dep. of Bills*, at 12–14, 85–87. Plaintiff's admission that there were *some* duties and expectations that he could not perform does not amount to a concession that he could not perform the "essential functions" of his job, because not every duty is an "essential function" of a job.[5] Because Plaintiff testified that there were various duties he *could* perform while working at the bloom station even after his vision deteriorated, whether Plaintiff could perform the "essential functions" of his job is an issue of material fact in dispute. As a result, the Court rejects Defendant's claim that Plaintiff was not a qualified disabled person as a matter of law, and finds that Plaintiff has stated a prima facia case of discrimination.

### 2. Whether Plaintiff Has Established a Legitimate Reason for Termination

As stated earlier, if the first step of *McDonnell Douglas* is satisfied then the court moves to the second step, where "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the negative action taken against the complainant."

---

[4] *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 8 n.3 (emphasis added).
[5] *See W. Va. Univ./Ruby Mem'l Hosp. v. W. Va. Human Rights Comm'n ex rel. Prince*, 617 S.E.2d 524, 531 (W. Va. 2005) (finding that "clerical and computer work were essential functions" of plaintiff's job when they accounted "for as much as *fifty percent of the duties*.") (emphasis added); *see also Williams v. Charleston Area Medical Center, Inc.*, 592 S.E.2d 794, 801 (W. Va. 2003) (stating that the plaintiff "was unable to perform an essential part of his job," and therefore his employer "had no responsibility to eliminate a *substantial* portion of his job *duties*.") (emphasis added) (Starcher, J., concurring).

Defendant clearly has articulated a nondiscriminatory reason for firing Plaintiff: it determined that Plaintiff was "unable to perform the essential functions of his position with or without accommodation." *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 10. Thus, the Court will move to the third step.

### 3. Whether Plaintiff Has Offered Evidence of Pretext

Because Defendant has satisfied the second step of *McDonnell Douglas*, Plaintiff must set forth sufficient evidence to "prove that the employer's reason was pretextual." A plaintiff may prove pretext "by showing that [the employer's] proffered reason is not worthy of belief." *Williams v. Staples, Inc.*, 372 F.3d 662, 669 (4th Cir. 2004).

The Court holds that Plaintiff has set forth sufficient evidence to demonstrate that Defendant's proffered reason for terminating him—that he was unable to perform the essential functions of his position even with accommodations—is not worthy of belief. First, Plaintiff's vision was so impaired in 2016 that he could no longer read, but the first documented evidence that Plaintiff was allegedly unable to perform the essential functions of his position is from January of 2018, merely two months before Plaintiff's termination, when Mr. Cloninger emailed Defendant's corporate office. A reasonable jury could find that if Defendant truly believed Plaintiff was unable to perform the essential functions of his position there would have been a record or evidence of this concern long before Plaintiff was terminated, not merely two months before.

Second, Mr. Cloninger testified that it was not until February of 2018, just the month before Plaintiff was fired, that he "realized how bad [Plaintiff's] eyesight was." *See Dep. of Cloninger*, at 65–66. Importantly, Mr. Cloninger states that this awareness stemmed from what Plaintiff "started telling" him, and thus *not* from any alleged difficulties that Mr. Cloninger *observed* Plaintiff encountering while he was working. *See id.* This admission from Mr. Cloninger provides support

for the inference that Defendant did not fire Plaintiff because of difficulties he had performing his duties due to his vision, but rather because of the *stereotypical beliefs it held* of what a person with severe vision problems is capable of. While this distinction is subtle, it is crucial in determining whether pretext has been demonstrated. *See Skaggs*, 479 S.E.2d at 584 (holding that to prove pretext a plaintiff need not "prove that the defendant 'is intentionally misstating' its explanation," because "[t]hat requirement overlooks the possibility that *subconscious or stereotypical thinking* may have motivated the employer to take action against the plaintiff. For example, an employer could quite honestly testify that it fired a female employee because of her job performance, yet the plaintiff might still be able to establish 'pretext' by proving that the employer subconsciously evaluated women differently."). For these reasons, Plaintiff has asserted sufficient evidence to demonstrate pretext.

**B. Defendant's Affirmative Defense That Plaintiff Was a Direct Threat**

The regulations interpreting the WVHRA, promulgated by the West Virginia Human Rights Commission, do not require an employer to retain an employee if the employee is not "currently capable of performing the work … without posing a *direct threat* of injury to the health and safety of other employees or the public." W. Va. Code R. § 77-1-4.2, 4.3 (emphasis added). "In deciding whether an individual poses a direct threat to health and safety, the employer has the burden of demonstrating that a reasonable probability of a materially enhanced risk of substantial harm to the health or safety of the individual or others cannot be eliminated or reduced by reasonable accommodation. The employer's determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical

judgement that relies on the most current medical knowledge and/or on the best available objective evidence" *See id.* at 4.8.

Both Plaintiff and Defendant argue that they are entitled to summary judgment on the affirmative defense of whether Plaintiff posed a direct threat to the safety of others. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 13; *Mem. in Supp. of Pl.'s Mot. for Partial Summ. J.*, at 1–2, 8. However, because this issue raises questions of fact, the Court rejects both parties' arguments.

Plaintiff's motion for summary judgment must be denied because Defendant has sufficient evidence to convince a jury that it was objectively reasonable to believe[6] that Plaintiff was not capable of performing work in a fast paced environment near hot oils and knives without posing a direct threat of injury to others. One of its employees, Mr. Cloninger, notified Defendant's corporate office that Plaintiff could no longer read tickets, print his own labels from the label maker, measure ingredients, or see if dishes were dirty. As a result of these concerns, rather than making a decision independently, Defendant asked Plaintiff's treating physician whether Plaintiff could safely perform his job duties without posing a reasonable risk of safety to himself or others. *See Dep. of Morris-McGrath*, at 53. Plaintiff's physician did not ease Defendant's concerns, only stating that it is "impossible to predict someone's ability to perform job duties and job descriptions based solely on their level of visual function," and that Defendant should observe Plaintiff working and see if he can perform the duties that are required based on his job description. It is reasonable to believe that after Defendant observed Plaintiff it concluded that because his eyesight was so poor that he could not read tickets, print his own labels, measure ingredients, or recognize dirty

---

[6] *See Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) ("[i]n evaluating an employer's direct-threat contention [under federal legislation], the … fact-finder's role is to determine whether the employer's decision was objectively reasonable."); *Heldreth v. Rahimian*, 637 S.E.2d 359, 365 n.9 (W. Va. 2006) (explaining the West Virginia Supreme Court's "longstanding practice of applying the same analytical framework used by the federal courts when deciding cases arising under the W.Va. Human Rights Act especially where the critical language of our Act ... parallels the federal legislation.") (internal quotations omitted).

dishes, this same poor vision made Plaintiff a direct threat to those around him when working in a fast paced environment near hot oils and knives.

While Plaintiff argues that he "had not cut himself, ran into anyone, burned himself with oil or had any kind of accident in the workplace,"[7] the regulations state that an employer only has the burden of demonstrating a "reasonable probability" of a materially enhanced risk of substantial harm, *not* the burden of demonstrating certainty. It is not objectively unreasonable as a matter of law for an employer to believe that there is a reasonable probability of a materially enhanced risk of dangerous instances happening in the future involving knives or oils merely because such an accident had not occurred in the past. To hold otherwise would require Defendant to wait until Plaintiff harmed someone with a knife or hot oil due to his eyesight before it could act to protect those around him. Certainly, Defendant does not have to be potentially liable for negligence in order to avoid liability for discrimination. Further, even if this Court were to find it unreasonable to believe that Plaintiff posed any risk due to working near hot oils and knives, Defendant submitted evidence that it witnessed Plaintiff struggle to identify dirty dishes, and that it believes this fact could lead to foodborne illnesses in customers. *See Dep. of Morris-McGrath*, at 22, 103. This fact alone is sufficient for Defendant to meet its direct threat burden.

Plaintiff also argues that Defendant cannot demonstrate that Plaintiff was a direct threat because Defendant's assessment was not "based on a reasonable medical judgement that relies on the most current medical knowledge and/or on the best available objective evidence," as required by law. *See Mem. in Supp. of Pl.'s Mot. for Partial Summ. J.*, at 9. In support, Plaintiff asserts that this case is similar to *Davidson v. Shoney's Big Boy Restaurant*, 380 S.E.2d 232 (W. Va. 1989),

---

[7] *See Mem. in Supp. of Pl.'s Mot. for Partial Summ. J.*, at 2–3.

where "there was a total lack of any competent medical evidence to support the discharge." *See id.* at 10. Plaintiff's comparison is flawed.

As Plaintiff himself points out, the employer in Davidson made "*no attempt* … to obtain any medical information as to the particular nature of [plaintiff's] handicap or whether it would … cause a substantial risk of injury to herself or others." *See Mem. in Supp. of Pl.'s Mot. for Partial Summ. J.*, at 11 (emphasis added). However, Defendant in this case, unlike the defendant in *Davidson*, *did* attempt to obtain medical information by writing two letters to Plaintiff's doctor asking if Plaintiff could perform his essential job duties and perform them safely. After the second letter, Plaintiff's doctor expressed to Defendant that it was "*impossible* to predict" someone's ability to perform based solely on their level of visual function, and that "Defendant [should] observe Plaintiff working" in order to reach a conclusion. Thus, after reaching out to Plaintiffs personal doctor, Defendant was essentially told that "reasonable medical judgement" required *it* to make the decision based on its *own* observations. Therefore, Defendant did not fail to reach its decision "based on a reasonable medical judgement," and Plaintiff's motion for partial summary judgment on the direct threat affirmative defense must be denied.

However, Defendant's motion for summary judgment on its direct threat defense must also be denied because Plaintiff has asserted sufficient evidence for a jury to find that it was not objectively reasonable to believe that Plaintiff would pose a direct threat of injury to others. For example, while the Court held above that the absence of dangerous incidents in Plaintiff's history involving knives or oils is not dispositive of the direct threat issue, the history is nonetheless relevant and material to Plaintiff's position. A jury could conclude that, because Plaintiff worked with vision so poor that he could no longer read for at least two years without any incidents involving knives or hot oils, it was objectively unreasonable to believe that continuing to work

with knives and hot oils created a *reasonable* probability of a *materially* enhanced risk of substantial harm. Additionally, regarding Defendant's claim that Plaintiff struggled to identify dirty dishes, which could lead to customer illnesses, Plaintiff disputes this alleged difficulty. *See Dep. of Bills*, at 76. For these reasons, Defendant's motion for summary judgment on its direct threat affirmative defense must also be denied.

**C. Discrimination Based on Failure to Provide Accommodations**

Lastly, Defendant argues that it is entitled to summary judgment on Plaintiff's claim that Defendant failed to provide reasonable accommodations. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 16. Because a question of fact exists as to what the essential functions of Plaintiff's position were, and Defendant admits that it failed to accommodate at least *one* of the essential functions, Defendant's motion for summary judgment is denied.

Under the WVHRA, not only is it discrimination for an employer to consider "an employee's … impairment in making employment decisions if the impairment does not affect his or her ability to perform the job," but it is also discrimination for an employer *not* to consider "the impairment to determine whether an accommodation is needed and available to permit the employee or applicant to perform the job." *Skaggs*, 479 S.E.2d at 574 n.7 (W. Va. 1996). Stated another way, under the WVHRA employers have "an affirmative obligation to provide reasonable accommodation for disabled individuals." *See id.* at 573–74.

To successfully state a discrimination claim via an employer's failure to accommodate, a plaintiff must prove, among other elements, that the plaintiff required an accommodation in order to perform the essential functions of the job, a reasonable accommodation existed that met the plaintiff's needs, and that the employer failed to provide the accommodation. *See Skaggs*, 479 S.E.2d at 575.

Defendant argues that "Plaintiff cannot show that a reasonable accommodation existed that enabled him to perform the essential functions of his position" for two reasons. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 16. Defendant claims, first, that "no reasonable accommodation would allow Plaintiff to perform the essential functions of his position," and, second, that "[n]either Plaintiff nor his physician identified an accommodation that would allow Plaintiff to perform the essential functions of his position." *See id.* at 16, 18.

Defendant's first argument must be rejected because of Defendant's own concession. Defendant asserts that "[d]ifferent suggestions for accommodations have been made by Plaintiff throughout this case … [such as] magnification, creating larger recipe cards, [and] using a color-coding system for measuring cups," and it *concedes* that these suggestions "might potentially allow Plaintiff to perform *one* of his essential functions." *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 19 (emphasis added). Nevertheless, Defendant claims that Plaintiff's suggestions would not "allow him to perform *all* of his essential functions," and thus it is entitled to summary judgment on this accommodation issue. *See id.* However, as discussed earlier, what qualifies as the "essential functions" of Plaintiff's position remains a question of fact. Under these circumstances, the Court cannot hold as a matter of law that Plaintiff cannot show a reasonable accommodation existed to enable him to perform *all* of the essential functions of his position when it has not been determined what the essential functions of his position were. Therefore, the Court must reject Defendant argument that no reasonable accommodation would allow Plaintiff to perform the essential functions of his position.

With respect to Defendant's second argument that neither Plaintiff nor his physician identified an accommodation that would allow Plaintiff to perform the essential functions of his position, the Court finds this specific fact immaterial. Defendant has cited no support for the

proposition that it is the responsibility of an employee or their physician to specifically "identify" an accommodation. Rather, to successfully state a discrimination claim for failure to accommodate a plaintiff need only demonstrate that the employer "knew or *should have known* of the plaintiff's needs and of the accommodation." *Skaggs*, 479 S.E.2d at 575 (emphasis added). If Defendant terminated Plaintiff because of, for example, his failure to perform the essential function of measuring ingredients, it can be reasonably inferred based on the facts of this case that Defendant "knew or should have known" that this failure was due to Plaintiff's poor vision, and that a color-coding system for measuring cups would fix the problem. Thus, even if Plaintiff failed to identify specific accommodations, Plaintiff has not, as a matter of law, failed to show that a reasonable accommodation existed that enabled him to perform the essential functions of his position. For this reason, and the reasons stated earlier, the Court denies Defendant's motion for summary judgment.

**IV. Conclusion**

Based upon the analysis provided above, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (ECF No. 37) and **DENIES** Defendant's Motion for Summary Judgment (ECF No. 39).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

        ENTER:    July 31, 2019

        ROBERT C. CHAMBERS
        UNITED STATES DISTRICT JUDGE